# Exhibit 1
# Congressional Record

This quiet but enthusiastic giant of the Tetons, whose understanding and appreciation and eloquence are not to be again matched, was truly special. His counsel was treasured and his encouragement was ever present. Truly his was a life worthy of emulation.

Mr. MITCHELL. Mr. President, I submit for the RECORD a statement regarding the 53d anniversary of the Kristallnacht, by Senator CRANSTON, who is at the Stanford Medical School Hospital for tests.

## ADDRESSING THE CYCLE OF PAIN

● Mr. CRANSTON. Mr. President, this week marks the 53d anniversary of Kristallnacht or as it is known in English "the night of broken glass." On November 9, 1938, the Nazis orchestrated pogroms across Germany and Austria, unleashing violent attacks against Jewish lives and property. The arson attacks on property and synagogues, the murder of hundreds, and the mass arrests of some 20,000 Jews were the most widespread and destructive signals until that time of Hitler's plan to eradicate the Jewish people.

The gruesome Holocaust which ensued cannot be forgotten by any of us.

Although the Jewish people have survived and from the ashes of the concentration camps the modern State of Israel was born, what remains of German Jewry is a remnant of what was.

German reunification and the different paths East and West Germany took in grappling with the past have brought German-Jewish relations into sharper focus. Reports of violence against foreigners in Germany serve as a stark reminder of the hatreds which can be aroused in the face of economic crisis. The resurgence of anti-Semitism in Eastern Europe has evoked fear in the hearts of many who remember the events leading up to the destruction of European Jewry.

Now, more than half a century after the cataclysmic events symbolized by Kristallnacht, Phil Blazer, the visionary publisher of the International Jewish News, has organized a conference to build bridges between Jews from around the world and Germans from Berlin and other cities.

Addressing the cycle of pain is a historic gathering intended as a living memorial to the 6 million lives destroyed during the Holocaust. From November 7–10, activists and scholars from around the world will meet in Berlin to study the lessons of the past and work toward building a future free of the scourge of anti-Semitism.

Although Kristallnacht was the most widespread rampage of its kind, it was certainly not the first sign of Hitler's murderous intentions. Fifteen years earlier, Hitler wrote "Mein Kampf" outlining his plans for world conquest. The first concentration camp was built in 1933 and the Nuremberg Laws of 1935 stripped German Jews of their civil rights. Yet, these signposts were all but ignored.

I want to commend the participants of this unprecedented conference for addressing the painful issues of the past head-on. We cannot afford to shy away from trying to understand the human tragedy of the Holocaust.

Mr. President, we must address the cycle of pain if we ever hope to bring it to a close.●

## TERRY ANDERSON

Mr. MOYNIHAN. Mr. President, I rise to inform my colleagues that today marks the 2,427th day that Terry Anderson has been held captive in Lebanon.

## HEALTH EQUITY AND ACCESS IMPROVEMENT ACT 1991

Mr. D'AMATO. Mr. President, I rise today to join Senators CHAFEE, COHEN, MCCAIN, and numerous others in introducing the Health Equity and Access Improvement Act of 1991. This bill contains several carefully crafted, achievable reforms that will go a long way toward making health care more accessible and affordable for all Americans.

Americans are dissatisfied with many aspects of our Nation's health care system—and with good reason. Health care costs are running out of control. With national health expenditures of $2,354 per person in 1989, our Nation spends more per capita than any other industrialized nation. At the same time, too many Americans are lacking in even the most basic coverage against the costs of medical care.

We need to address these flaws in our health care system, without threatening those elements of the system that Americans value, such as the ability to choose your own doctor, to avoid having to wait months for needed procedures, and to benefit from medical technology that is among the best in the world.

The Health Equity and Access Improvement Act is a package of reasonable proposals that will allow us to make significant progress toward this goal. Through an innovative combination of tax credits, insurance reforms, state demonstrations, and medical liability law reforms, this bill will help increase access to health care for those who are currently uninsured, while at the same time curbing the escalation of our Nation's health care costs.

Mr. President, those Americans without access to adequate health care cannot wait years for Congress to act on reform of the health care system. They need help immediately. This bill contains realistic, achievable proposals that can be implemented without delay. I am proud to be an original cosponsor of this bill to help millions of Americans who are currently underserved. I urge my colleagues to join me in cosponsoring this bill, and I urge its immediate adoption.

## TELEPHONE ADVERTISING CONSUMER RIGHTS ACT

Mr. HOLLINGS. Mr. President I ask unanimous consent that the Senate proceed to the immediate consideration of Calendar No. 261, S. 1410, the Telephone Advertising Consumer Rights Act.

The PRESIDING OFFICER. Without objection, it is so ordered. The clerk will report.

The legislative clerk read as follows:

A bill (S. 1410) relating to the rights of consumers in connection with telephone advertising.

The PRESIDING OFFICER. Is there objection to the immediate consideration of the bill?

There being no objection, the Senate proceeded to consider the bill, which had been reported from the Committee on Commerce, Science, and Transportation, with an amendment to strike all after the enacting clause and insering in lieu thereof the following:

*SECTION 1. SHORT TITLE.*

*This Act may be cited as the "Telephone Advertising Consumer Rights Act".*

*SEC. 2. FINDINGS.*

*The Congress finds that:*

*(1) The use of the telephone to market goods and services to the home and other businesses is now pervasive due to the increased use of cost-effective telemarketing techniques.*

*(2) Over 30,000 businesses actively telemarket goods and services to business and residential customers.*

*(3) More than 300,000 solicitors call more than 18,000,000 Americans every day.*

*(4) Total United States sales generated through telemarketing amounted to $435,000,000,000 in 1990, a more than four-fold increase since 1984.*

*(5) Unrestricted telemarketing, however, can be an intrusive invasion of privacy and, when an emergency or medical assistance telephone line is seized, a risk to public safety.*

*(6) Many consumers are outraged over the proliferation of intrusive, nuisance calls to their homes from telemarketers.*

*(7) Over half the States now have statutes restricting various uses of the telephone for marketing, but telemarketers can evade their prohibitions through interstate operations; therefore, Federal law is needed to control residential telemarketing practices.*

*(8) The Constitution does not prohibit restrictions on commercial telemarketing solicitations.*

*(9) Individuals privacy rights, public safety interests, and commercial freedoms of speech and trade must be balanced in a way that protects the privacy of individuals and permits legitimate telemarketing practices.*

*SEC. 3. RESTRICTIONS ON THE USE OF TELEPHONE EQUIPMENT FOR ADVERTISING.*

*(a) AMENDMENT.—Title II of the Communications Act of 1934 (47 U.S.C. 201 et seq.) is amended by adding at the end the following new section:*

*"SEC. 228. RESTRICTIONS ON THE USE OF TELEPHONE EQUIPMENT FOR ADVERTISING.*

*"(a) DEFINITIONS.—As used in this section:*

*"(1) The term 'automatic telephone dialing system' means equipment which has the capacity—*

*November 7, 1991* CONGRESSIONAL RECORD—SENATE 30817

"(A) to store or produce telephone numbers to be called, using a random or sequential number generator; and

"(B) to dial such numbers.

"(2) The term 'telephone facsimile machine' means equipment which has the capacity to transcribe text or images, or both, from paper into an electronic signal and to transmit that signal over a regular telephone line.

"(3) The term 'unsolicited telephone solicitation' means a telephone call by a live person for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services, or for other commercial purposes, which is transmitted to any person without that person's prior express invitation or permission. Such term does not include calls or messages made by or on behalf of a tax exempt nonprofit organization.

"(4) The term 'unsolicited advertisement' means any material advertising the commercial availability or quality of any property, goods, or services which is transmitted to any person without that person's prior express invitation or permission.

"(b) RESTRICTIONS.—It shall be unlawful for any person within the United States by means of telephone—

"(1) to make any unsolicited telephone solicitation in violation of the regulations prescribed by the Commission pursuant to subsection (c);

"(2) to send an unsolicited advertisement by a facsimile machine; and

"(3) to make any call using any automatic telephone dialing system, or an artificial or prerecorded voice—

"(A) to any emergency telephone line or pager of any hospital, medical physician or service office, health care facility, or fire protection or law enforcement agency; or

"(B) to any telephone number assigned to paging or cellular telephone service.

"(c) PROTECTION OF SUBSCRIBER PRIVACY RIGHTS.—

"(1) RULEMAKING PROCEEDING REQUIRED.—Within 120 days after the date of enactment of this section, the Commission shall initiate a rulemaking proceeding concerning the need to protect residential telephone subscribers' privacy rights to avoid receiving unsolicited telephone solicitations to which they object. The proceeding shall—

"(A) further define 'unsolicited telephone solicitation' consistent with subsection (a)(3);

"(B) compare and evaluate alternative methods and procedures, including the use of telephone electronic databases, telephone network technologies, special directory markings, industry and company based 'do not call' systems, and any other alternatives, individually or in combination, for protecting such privacy rights, in terms of their cost effectiveness and their other advantages and disadvantages;

"(C) evaluate the categories of public and private entities that would have the capacity to establish and administer such methods and procedures;

"(D) consider whether such methods and procedures may apply for local telephone solicitations, such as those of small businesses or holders of second class mail permits; and

"(E) develop proposed regulations to implement the methods and procedures that the Commission determines are most effective and efficient to accomplish the purposes of this section.

"(2) REGULATIONS.—Not later than 240 days after the date of enactment of this section, the Commission shall conclude the rulemaking proceeding initiated under paragraph (1) and shall prescribe regulations to implement methods and procedures for protecting the privacy rights described in such paragraph in an efficient, effective, and economic manner and without the imposition of any additional charge to telephone subscribers.

"(d) TECHNICAL AND PROCEDURAL STANDARDS.—

"(1) PROHIBITION.—It shall be unlawful for any person within the United States—

"(A) to initiate any communication using a telephone facsimile machine, or to make any telephone call using any automatic telephone dialing system that does not comply with the technical and procedural standards prescribed under this subsection, or to use any telephone facsimile machine or automatic telephone dialing system (to make any telephone solicitation) in a manner that does not comply with such standards; or

"(B) to use a computer or other electronic device to send any message via a telephone facsimile machine unless such person clearly marks, in a margin at the top or bottom of each transmitted page of the message or on the first page of each transmission, the date and time it is sent and an identification of the business sending the message and the telephone number of the sending machine or of such business.

"(2) TELEPHONE FACSIMILE MACHINES.—The Commission shall revise the regulations setting technical and procedural standards for telephone facsimile machines to require that any such machine which—

"(A) is manufactured after 6 months after the date of enactment of this section; and

"(B) can be used for the distribution of unsolicited advertising,

clearly marks, in a margin at the top or bottom of each transmitted page or on the first page of each transmission, the date and time sent, an identification of the business sending the message, and the telephone number of the sending machine or of such business. The Commission shall exempt from such standards, for 18 months after such date of enactment, telephone facsimile machines that do not have the capacity for automatic dialing and transmission and that are not capable of operation through an interface with a computer.

"(3) ARTIFICIAL OR PRERECORDED VOICE SYSTEMS.—The Commission shall prescribe technical and procedural standards for systems that are used to transmit any artificial or prerecorded voice message via telephone. Such standards shall require that—

"(A) all artificial or prerecorded telephone messages (i) shall, at the beginning of the message, state clearly the identity of the business initiating the call, and (ii) shall, during or after the message, state clearly the telephone number or address of such business; and

"(B) any such system will automatically release the called party's line within 5 seconds of the time the system receives notification that the called party has hung up, to allow the called party's line to be used to make or receive other calls.

"(e) STATE LAW NOT PREEMPTED.—Nothing in this section or in the regulations prescribed under this section shall preempt any State law that imposes more restrictive intrastate requirements or regulations on, or which prohibits—

"(1) the use of telephone facsimile machines or other electronic devices to send unsolicited advertisements;

"(2) the use of automatic telephone dialing systems to transmit prerecorded telephone solicitations; and

"(3) the use of artificial voice or prerecorded messages.

"(f) PREEMPTION OF INCONSISTENT INTERSTATE COMMUNICATIONS LAWS.—This section preempts any provisions of State law concerning interstate communications that are inconsistent with the interstate communications provisions of this section.".

(b) CONFORMING AMENDMENT.—Section 2(b) of the Communications Act of 1934 (47 U.S.C. 152(b)) is amended by striking "and 225" and inserting in lieu thereof ", 225, and 228".

Mr. PRESSLER. Mr. President, I support Senate passage of S. 1410, the Telephone Advertising Consumer Rights Act. I introduced this legislation in response to the national outcry over the explosion of unsolicited telephone advertising. Many consumers in my home State of South Dakota are simply tired of the nuisance of unwanted telephone solicitations. New technologies when combined with the telephone now give modern door-to-door salesmen an unrestricted ability to invade the privacy of our homes at any time.

Unlike other communications media, the telephone commands our instant attention. Junk mail can be thrown away. Television commercials can be turned off. The telephone demands to be answered.

People are increasingly upset over this invasion of their privacy by unrestricted telemarketing. In fact, the consumer backlash that has arisen from the cost and the interference of unsolicited telemarketing calls has sparked the introduction of over 1,000 bills in State legislatures around the country seeking to limit this abuse. We have heard the complaints of consumers.

This past June, we held hearings in the Commerce, Science, and Transportation Committee on S. 1410. During these hearings, we received testimony from consumer advocates, private citizens, and representatives of the telemarketing industry. The testimony we received was clear. The Federal Government needs to act now to provide uniform legislation to protect consumers.

The primary purpose of this legislation is to develop the necessary ground rules for cost-effective protection of consumers from unwanted telephone solicitations. These rules should allow responsible telemarketers to reach consumers who are most responsive to this form of solicitation, while eliminating the cost and time of contacting those individuals who would be least responsive.

To accomplish this balanced approach, the substitute we have before us today directs the FCC to prescribe regulations to protect the privacy rights of consumers from the intrusion of unsolicited telephone marketing calls. One such proposal the FCC would consider is the use of a telephone electronic database that would allow consumers to have their phone numbers protected from unsolicited advertising. This type of consumer protection has already been used with great success in the State of Florida. Another proposal the FCC would examine is the placement of all telemarketers on a single exchange, thus allowing consumers to block calls from that exchange.

Some objected to the original legislation because of the extent to which it outlined the safeguards necessary for

the creation of a national database. It is important to note that this substitute bill does not mandate the creation of an electric database. Rather, it gives the FCC flexibility in deciding the best approach to handling this problem. Personally, and in the eyes of many others, it appears that an electronic database clearly offers the most promising protection for consumers. However, we recognize that newer technologies may arise in the future. For this reason, our legislation directs the FCC to consider a number of alternatives.

We included in the substitute a provision that directs the FCC to examine whether local telephone solicitations by small businesses and second class mail permit holders should be subject to the same FCC regulations that would apply to all other telemarketers. Many small businesses conduct responsible telemarketing in the local areas they serve. Since their business depends upon their good standing in the community, they conduct their own telemarketing in a very respectable way.

This bill will not prohibit businesses from contacting their established customers. For example, if a credit card company like Citibank needs to contact a customer regarding their credit card account, clearly this would be allowed.

We have directed the FCC to further define the rules and regulation needed to allow businesses to contact customers who expected to receive calls from companies they do business with.

The purpose of the substitute is to prohibit cold calls by any telemarketer to the telephone of a consumer who has no connection or affiliation with that business and who has affirmatively taken action to prevent such calls. Responsible telemarketers will save both time and money by contacting only people who are most likely to respond positively to such solicitations.

S. 1410 also addresses problems arising from computerized calls. Due to advances in autodialer technology, machines can be programmed to deliver a prerecorded message to thousands of sequential phone numbers.

This results in calls to hospitals, emergency care providers, unlisted numbers, and paging and cellular equipment. There have been many instances of autodial machines hitting hospital switchboards and sequentially delivering a recorded message to all telephone lines. In some cases, the calling machine does not release the called party's line until the recorded message has ended. This renders the called party's phones inoperable. In an emergency situation, this can create a real hazard.

To remedy this situation, the substitute requires autodialer machines to release the phone line automatically after the called party hangs up. In addition, it requires all prerecorded messages to clearly identify the name, phone number, or address of the person or business initiating the call.

This bill also allows hospitals, police stations, fire stations, and owners of paging and cellular equipment to eliminate all unsolicited calls.

The growth of facsimile machines in the workplace has brought another form of unsolicited advertising—the junk fax. Unsolicited facsimile advertising ties up fax machines and uses the called party's fax paper. This costs the recipient both time and money. The substitute bill requires that autodial fax machines clearly mark on all transmissions the date and time of transmission, the identity of the sender, and the telephone number of the sending machine.

The substitute will not end all unsolicited calls, but it will allow consumers to choose how their telephones are used and requires vendors to respect that decision. The balanced approach taken by this legislation, should ensure a robust telemarketing industry while giving consumers relief from unwanted telephone solicitations.

AMENDMENT NO. 1310

(Purpose: To make an amendment in the nature of a substitute)

Mr. WARNER. Mr. President, on behalf of Mr. PRESSLER, I send a substitute amendment to the desk for immediate consideration.

The PRESIDING OFFICER. The clerk will report the substitute amendment.

The legislative clerk read as follows:

The Senator from Virginia [Mr. WARNER], for Mr. PRESSLER, proposes an amendment numbered 1310.

Mr. WARNER. Mr. President, I ask unanimous consent that reading of the amendment be dispensed with.

The PRESIDING OFFICER. Without objection, it is so ordered.

The amendment reads as follows:

Strike all after the enacting clause and insert in lieu thereof the following:

SECTION 1. SHORT TITLE.

This Act may be cited as the "Telephone Advertising Consumer Rights Act".

SEC. 2. FINDINGS.

The Congress finds that:

(1) The use of the telephone to market goods and services to the home and other businesses is now pervasive due to the increased use of cost-effective telemarketing techniques.

(2) Over 30,000 businesses actively telemarket goods and services to business and residential customers.

(3) More than 30,000 solicitors call more than 18,000,000 Americans every day.

(4) Total United States sales generated through telemarketing amounted to $435,000,000,000 in 1990, a more than four-fold increase since 1984.

(5) Unrestricted telemarketing, however, can be an intrusive invasion of privacy and, when an emergency or medical assistance telephone line is seized, a risk to public safety.

(6) Many consumers are outraged over the proliferation of intrusive, nuisance calls to their homes from telemarketers.

(7) Over half the States now have statutes restricting various uses of the telephone for marketing, but telemarketers can evade their prohibitions through interstate operations; therefore, Federal law is needed to control residential telemarketing practices.

(8) The Constitution does not prohibit restrictions on commercial telemarketing solicitations.

(9) Individuals' privacy rights, public safety interests, and commercial freedoms of speech and trade must be balanced in a way that protects the privacy of individuals and permits legitimate telemarketing practices.

SEC. 3. RESTRICTIONS ON THE USE OF TELEPHONE EQUIPMENT FOR ADVERTISING.

(a) AMENDMENT.—Title II of the Communications Act of 1934 (47 U.S.C. 201 et seq.) is amended by adding at the end the following new section:

"SEC. 228. RESTRICTIONS ON THE USE OF TELEPHONE EQUIPMENT FOR ADVERTISING.

"(a) DEFINITIONS.—As used in this section:

"(1) The term 'automatic telephone dialing system' means equipment which has the capacity—

"(A) to store or produce telephone numbers to be called, using a random or sequential number generator; and

"(B) to dial such numbers.

"(2) The term 'telephone facsimile machine' means equipment which has the capacity to transcribe text or images, or both, from paper into an electronic signal and to transmit that signal over a regular telephone line.

"(3) The term 'unsolicited telephone solicitation' means a telephone call by a live person for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services which is transmitted to any person without that person's prior express invitation or permission. Such term does not include calls or messages made by or on behalf of a tax exempt nonprofit organization.

"(4) The term 'unsolicited advertisement' means any material advertising the commercial availability or quality of any property, goods, or services which is transmitted to any person without that person's prior express invitation or permission.

"(b) RESTRICTIONS.—It shall be unlawful for any person within the United States by means of telephone—

"(1) to make any unsolicited telephone solicitation in violation of the regulations prescribed by the Commission pursuant to subsection (c);

"(2) to send an unsolicited advertisement by a facsimile machine; and

"(3) to make any call (other than a call made for emergency purposes or made with the prior consent of the called party) using any automatic telephone dialing system, or an artificial or prerecorded voice—

"(A) to any emergency telephone line or pager (including any '911' line and any emergency line or pager of a hospital, medical physician or service office, health care facility, or fire protection or law enforcement agency) or to the telephone line of any guest room or patient room of a hospital, health care facility, elderly home, or similar establishment; or

"(B) to any telephone number assigned to a paging service, cellular telephone service, specialized mobile radio service, or radio common carrier service, or any other service for which the called party is charged for the call.

"(c) PROTECTION OF SUBSCRIBER PRIVACY RIGHTS.—

"(1) RULEMAKING PROCEEDING REQUIRED.—Within 120 days after the date of enactment of this section, the Commission shall initiate a rulemaking proceeding concerning the need to protect residential telephone subscribers' privacy rights to avoid receiving unsolicited telephone solicitations to which they object. The proceeding shall—

"(A) further define 'unsolicited telephone solicitation' consistent with subsection (a)(3);

"(B) compare and evaluate alternative methods and procedures, including the use of telephone electronic databases, telephone network technologies, special directory markings, industry and company based 'do not call' systems, and any other alternatives, individually or in combination, for protecting such privacy rights, in terms of their cost effectiveness and their other advantages and disadvantages;

"(C) evaluate the categories of public and private entities that would have the capacity to establish and administer such methods and procedures;

"(D) consider whether such methods and procedures may apply for local telephone solicitations, such as those of small businesses or holders of second class mail permits; and

"(E) develop proposed regulations to implement the methods and procedures that the Commission determines are most effective and efficient to accomplish the purposes of this section.

"(2) REGULATIONS.—Not later than 240 days after the date of enactment of this section, the Commission shall conclude the rulemaking proceeding initiated under paragraph (1) and shall prescribe regulations to implement methods and procedures for protecting the privacy rights described in such paragraph in an efficient, effective, and economic manner and without the imposition of any additional charge to telephone subscribers.

"(d) TECHNICAL AND PROCEDURAL STANDARDS.—

"(1) PROHIBITION.—It shall be unlawful for any person within the United States—

"(A) to initiate any communication using a telephone facsimile machine, or to make any telephone call using any automatic telephone dialing system that does not comply with the technical and procedural standards prescribed under this subsection, or to use any telephone facsimile machine or automatic telephone dialing system (to make any telephone solicitation) in a manner that does not comply with such standards; or

"(B) to use a computer or other electronic device to send any message via a telephone facsimile machine unless such person clearly marks, in a margin at the top or bottom of each transmitted page of the message or on the first page of each transmission, the data and time it is sent and an identification of the business, other entity, or individual sending the message and the telephone number of the sending machine or of such business, other entity, or individual.

"(2) TELEPHONE FACSIMILE MACHINES.—The Commission shall revise the regulations setting technical and procedural standards for telephone facsimile machines to require that any such machine which—

"(A) is manufactured after 6 months after the date of enactment of this section; and

"(B) can be used for the distribution of unsolicited advertising, clearly marks, in a margin at the top or bottom of each transmitted page or on the first page of each transmission, the date and time sent, an identification of the business, other entity, or individual sending the message, and the telephone number of the sending machine or of such business. The Commission shall exempt from such standards, for 18 months after such date of enactment, telephone facsimile machines that do not have the capacity for automatic dialing and transmission and that are not capable of operation through an interface with a computer.

"(3) ARTIFICIAL OR PRERECORDED VOICE SYSTEMS.—The Commission shall prescribe technical and procedural standards for systems that are used to transmit any artificial or prerecorded voice message via telephone. Such standards shall require that—

"(A) to the extent not otherwise prohibited by law, all artificial or prerecorded telephone messages (i) shall, at the beginning of the message, state clearly the identity of the business, other entity, or individual initiating the call, and (ii) shall, during or after the message, state clearly the telephone number or address or such business, other entity, or individuals; and

"(B) any such system will automatically release the called party's line within 5 seconds of the time the system receives notification that the called party has hung up, to allow the called party's line to be used to make or receive other calls.

"(e) PRIVATE RIGHT OF ACTION.—A person who has received more than one telephone call from the same entity, or delivering the same or a similar message, in violation of this section or regulations prescribed under this section may, if otherwise permitted by the laws or rules of court of a State, bring in an appropriate court of that State an action in such person's own name to enjoin such calls, an action to recover for actual monetary loss or be awarded $500 in damages for each violation, whichever is greater, or both such actions. The court may, in its discretion, increase the award for monetary loss to an amount not to exceed three times the actual monetary loss, or to increase the award of damages to an amount not to exceed $1,500 for each violation, if the court finds the defendant willfully or knowingly violated such regulations.

"(f) ACTIONS BY STATE ATTORNEYS GENERAL.—

"(1) AUTHORITY OF ATTORNEYS GENERAL.—Whenever the attorney general of a State, or an official or agency designated by a State, has reason to believe that any person has engaged or is engaging in a pattern or practice of telephone calls to residents of that State in violation of this section or the regulations prescribed under this section, the State may bring a civil action on behalf of its residents to enjoin such calls, an action to recover for actual monetary loss or $500 in damages for each violation, or both such actions. The court may, in its discretion, increase the award for monetary loss to an amount not to exceed three times the actual monetary loss, or to increase the award of damages to an amount not to exceed $1,500 for each violation, if the court finds the defendant willfully or knowingly violated such regulations.

"(2) EXCLUSIVE JURISDICTION OF FEDERAL COURTS.—The district courts of the United States, the United States courts of any territory, and the District Court of the United States for the District of Columbia shall have exclusive jurisdiction over all civil actions brought under this subsection. Upon proper application, such courts shall also have jurisdiction to issue writs of mandamus, or orders affording like relief, commanding the defendant to comply with the provisions of this section and regulations prescribed under this section, including the requirement that the defendant take such action as is necessary to remove the danger of violation of any such provision. Upon a proper showing, a permanent or temporary injunction or restraining order shall be granted without bond.

"(3) RIGHTS OF COMMISSION.—The State shall serve prior written notice of any such civil action upon the Commission and provide the Commission with a copy of its complaint, except in any case where such prior notice is not feasible, in which case the States shall serve such notice immediately upon instituting such action. The Commission shall have the right (A) to intervene in the action, (B) upon so intervening, to be heard on all matters arising therein, and (C) to file petitions for appeal.

"(4) VENUE; SERVICE OF PROCESS.—Any civil action brought under this subsection in a district court of the United States may be brought in the district wherein the defendant is found or is an inhabitant or transacts business or wherein the violation occurred or is occurring, and process in such cases may be served in any district in which the defendant is an inhabitant or wherever the defendant may be found.

"(5) INVESTIGATORY POWERS.—For purposes of bringing any civil action under this subsection, nothing in this section shall prevent the attorney general of a State from exercising the powers conferred on the attorney general by the laws of such State to conduct investigations or to administer oaths or affirmations or to compel the attendance of witnesses or the production of documentary and other evidence.

"(6) EFFECT ON STATE COURT PROCEEDINGS.—Nothing contained in this subsection shall be construed to prohibit an authorized State official from proceeding in State court on the basis of an alleged violation of any general civil or criminal statute of such State.

"(7) LIMITATION.—Whenever the Commission has instituted a civil action for violation of this section or regulations prescribed under this section, no State may, during the pendency of such action instituted by the Commission, subsequently institute a civil action against any defendant named in the Commission's complaint for any violation as alleged in the Commission's complaint.

"(8) DEFINITION.—As used in this subsection, the term 'attorney general' means the chief legal officer of a State.

"(g) STATE LAW NOT PREEMPTED.—Nothing in this section or in the regulations prescribed under this section shall preempt any State law that imposes more restrictive intrastate requirements or regulations on, or which prohibits—

"(1) the use of telephone facsimile machines or other electronic devices to send unsolicited advertisements;

"(2) the use of automatic telephone dialing systems to transmit prerecorded telephone solicitations; and

"(3) the use of artificial voice or prerecorded messages.

"(h) PREEMPTION OF INCONSISTENT INTERSTATE COMMUNICATIONS LAWS.—This section preempts any provisions of State law concerning interstate communications that are inconsistent with the interstate communications provisions of this section.".

(b) CONFORMING AMENDMENT.—Section 2(b) of the Communications Act of 1934 (47 U.S.C. 152(b)) is amended by striking "and 225" and inserting in lieu thereof ", 225, and 228".

The PRESIDING OFFICER. If there is no further debate, and no objection, the substitute amendment is agreed to.

So the amendment (No. 1310) was agreed to.

Mr. WARNER. Mr. President, I move to reconsider the vote by which the amendment was agreed to.

Mr. HOLLINGS. I move to lay that motion on the table.

The motion to lay on the table was agreed to.

Mr. GORE. Mr. President, I rise today in support of the legislation currently before the Senate. There are several items, however, on which I would like clarification. First, I am troubled by the fact that this bill does not contain a specific exception allowing businesses to call their existing customers. Earlier drafts of this legislation contained such an exception. Second, I want to be sure that the FCC has the flexibility to adopt from a wide array of options whatever types of rules they find necessary to protect the public interest. The reported bill does not specify which approach they must choose. For example, they are not required to adopt a national database of prohibited numbers. Finally, I have concerns regarding the directions given to the FCC to explore the effect of the regulations on local telephone solicitations, and the extent of the Federal system with regard to intrastate calling.

First, with regard to existing business relationships, it would seem to me that businesses need to be able to contact customers with whom they have a prior or existing relationship. Furthermore, these are the types of calls customers want to receive, because it informs them about promotional opportunities from vendors with whom they have had relationships.

Is it not true that the committee deleted the established business relationship exception from the bill because it did not want to become involved in the technicalities of determining what this phrase means? Nevertheless, is it not true the FCC may consider establishing different rules concerning calls made by businesses to their prior or existing customers?

Mr. PRESSLER. Yes, that is correct.

Mr. GORE. Also, with regard to the rulemaking to be conducted by the FCC to protect telephone subscribers' privacy rights, it is my understanding that the FCC is free to adopt any type of regulation that they decide accomplishes the purpose of this legislation. The committee has specifically directed that the FCC consider as one possibility the option of mandating companies to maintain company-based do not call systems to identify customers who do not wish to be called again by that company. Is that correct?

Mr. PRESSLER. Yes, that is correct.

Mr. GORE. Furthermore, I also noticed that the committee has directed the FCC to consider whether the procedures eventually adopted should apply to businesses that conduct primarily local telephone solicitations. While the committee cites small businesses and holders of second-class mail permits such as newspapers as two examples of companies that conduct these types of solicitations, am I correct in my understanding that any company conducting primarily local telephone solicitations might be included in this category? It would seem that the provision should apply to companies that conduct business locally, and thus become part of the community, and are subject to the scrutiny of the community, and must live by their reputation in the community, regardless of the specific type of business they conduct. For example, one of my constituents, Olan Mills, has photography studios located across the country. However, each location generally conducts its solicitations directly from the studio, within the local community. Nearly all of these calls are local in nature, and rarely cross State boundaries unless the studio is located in a community near a State line. Am I correct in believing that this is the kind of business meant by the committee to be considered under this provision?

Mr. PRESSLER. Yes, that is correct.

Mr. GORE. Finally, I would like a clarification as to the relationship between the Federal regulations to be enacted by the FCC and State laws in the area of intrastate telephone solicitations. It would seem to me that in the area of these telephone solicitations, it would be preferable to have the Federal law as a national scheme to protect telephone subscribers. While the States remain free to adopt laws affecting intrastate communications, I am sure the Senator would join me in encouraging the States to adopt laws consistent with the Federal system to facilitate the telemarketers' ability to comply fully with both the State and Federal laws regarding intrastate communications.

Mr. PRESSLER. The Senator is correct in his understanding.

Mr. GORE. I thank the Senator for the clarification.

The PRESIDING OFFICER. If there is no objection, the committee amendment, as amended, is agreed to and the bill is deemed to have read a third time and passed.

[The bill (S. 1410), as amended, will appear in a subsequent issue of the RECORD.]

Mr. HOLLINGS. Mr. President, I move to reconsider the vote.

Mr. WARNER. I move to lay that motion on the table.

The motion to lay on the table was agreed to.

## AUTOMATED TELEPHONE CONSUMER PROTECTION ACT

Mr. HOLLINGS. Mr. President, I ask unanimous consent the Senate proceed to the immediate consideration of Calendar 262, S. 1462, the Automated Telephone Consumer Protection Act.

The PRESIDING OFFICER. The clerk will report.

The legislative clerk read as follows:

A bill (S. 1462) to amend the Communications Act of 1934 to prohibit certain practices involving the use of telephone equipment for advertising and solicitation purposes.

The PRESIDING OFFICER. Is there objection to the immediate consideration of the bill?

There being no objection, the Senate proceeded to consider the bill which had been reported from the Committee on Commerce, Science, and Transportation, with an amendment to strike all after the enacting clause and inserting in lieu thereof the following:

### SECTION 1. SHORT TITLE.

This Act may be cited as the "Automated Telephone Consumer Protection Act".

### SEC. 2. RESTRICTIONS ON THE USE OF AUTOMATED TELEPHONE EQUIPMENT.

(a) AMENDMENT.—Title II of the Communications Act of 1934 (47 U.S.C. 201 et seq.) is amended by adding at the end the following new section:

"SEC. 228. RESTRICTIONS ON THE USE OF AUTOMATED TELEPHONE EQUIPMENT.

"(a) DEFINITIONS.—As used in this section—

"(1) The term 'automatic telephone dialing system' means equipment which has the capacity—

"(A) to store or produce telephone numbers to be called, using a random or sequential number generator; and

"(B) to dial such numbers.

"(2) The term 'telephone facsimile machine' means equipment which has the capacity to transcribe text or images, or both, from paper into an electronic signal and to transmit that signal over a regular telephone line.

"(3) The term 'unsolicited advertisement' means any material advertising the commercial availability or quality of any property, goods, or services which is transmitted to any person without that person's prior express invitation or permission.

"(b) RESTRICTIONS.—It shall be unlawful for any person within the United States—

"(1) to make any call using any automatic telephone dialing system or an artificial or prerecorded voice—

"(A) to any emergency telephone line of any hospital, medical physician or service office, health care facility, or fire protection or law enforcement agency; or

"(B) to any telephone number assigned to paging or cellular telephone service;

"(2) to initiate any telephone call to any residence using an artificial or prerecorded voice to deliver a message without the prior express consent of the called party, unless the call is initiated for emergency purposes; or

"(3) to send an unsolicited advertisement by a facsimile machine.

"(c) TECHNICAL AND PROCEDURAL STANDARDS.—

"(1) PROHIBITION.—It shall be unlawful for any person within the United States—

"(A) to initiate any communication using a telephone facsimile machine, or to make any telephone call using any automatic telephone dialing system that does not comply with the technical and procedural standards prescribed under this subsection, or to use any telephone facsimile machine or automatic telephone dialing system (to make any telephone solicitation) in a manner that does not comply with such standards; or

"(B) to use a computer or other electronic device to send any message via a telephone facsimile machine unless such person clearly

marks, in a margin at the top or bottom of each transmitted page of the message or on the first page of the transmission, the date and time it is sent and an identification of the business sending the message and the telephone number of the sending machine or of such business.

"(2) TELEPHONE FACSIMILE MACHINES.—The Commission shall revise the regulations setting technical and procedural standards for telephone facsimile machines to require that any such machine which—

"(A) is manufactured after 6 months after the date of enactment of this section, and

"(B) can be used for the distribution of unsolicited advertising,

clearly marks, in a margin at the top or bottom of each transmitted page or on the first page of each transmission, the date and time sent, an identification of the business sending the message, and the telephone number of the sending machine or of such business. The Commission shall exempt from such standards, for 18 months after such date of enactment, telephone facsimile machines that do not have the capacity for automatic dialing and transmission and that are not capable of operation through an interface with a computer.

"(3) ARTIFICAL OR PRERECORDED VOICE SYSTEMS.—The Commission shall prescribe technical and procedural standards for systems that are used to transmit any artificial or prerecorded voice message via telephone. Such standards shall require that—

"(A) all artificial or prerecorded telephone messages (i) shall, at the beginning of the message, state clearly the identity of the business initiating the call, and (ii) shall, during or after the massage, state clearly the telephone number or address of such business; and

"(B) any such system will automatically release the called party's line within 5 seconds of the time the system receives notification that the called party has hung up, to allow the called party's line to be used to make or receive other calls.

"(d) STATE LAW NOT PREEMPTED.—Nothing in this section or in the regulations prescribed under this section shall preempt any State law or regulations that imposes more restrictive intrastate requirements on, or which prohibits—

"(1) the use of telephone facsimile machines or other electronic devices to send unsolicited advertisements;

"(2) the use of automatic telephone dialing systems to transmit prerecorded telephone solicitations; or

"(3) the use of artificial or prerecorded voice messages.".

"(b) CONFORMING AMENDMENT.—Section 2(b) of the Communications Act of 1934 (47 U.S.C. 152(b)) is amended by striking "and 225" and inserting in lieu thereof ", 225, and 228".

Mr. HOLLINGS. Mr. President, I rise today to urge the Senate to approve S. 1462, the Automated Telephone Consumer Protection Act. The substitute amendment before the Senate addresses an enormous public nuisance. Computerized telephone calls are invading our homes and destroying our privacy. Consumers around the country are crying out for Congress to put a stop to these computerized telephone calls. Congress has a clear opportunity to protect the interests of our citizens, and we should not pass up this chance.

Computerized calls are the scourge of modern civilization. They wake us up in the morning; they interrupt our dinner at night; they force the sick and elderly out of bed; they hound us until we want to rip the telephone right out of the wall.

Even more important, these computerized telephone calls threaten our personal health and safety. In one case, a family that suffered an emergency illness could not call 911 because the telephone line was tied up by a computerized message. An elderly woman who was confined to bed in a hospital after surgery was constantly interrupted by computerized sales calls. Computerized calls tieup the emergency line of police, fire, and medical services and prevent real emergency calls from getting through.

These machines are out of control, and their use is growing by 30 percent every year. It is telephone terrorism, and it has got to stop.

Let me offer my colleagues a glimpse of the types of consumer complaints that I heard from some of my constituents in South Carolina concerning these computerized telephone calls.

Ms. Nadine Brock of the Anderson County Emergency Services testified as follows:

In my present position with the county government, we dispatch ambulances. And when these 911 calls are coming in from the computerized solicitations, it ties up those emergency lines. * * * So when these calls come in and tie up our emergency lines, then those real emergencies that come through cannot get through to us. And of course from the point of dispatching ambulances, this is a lifesaving emergency that we cannot meet when our lines are tied up on these computerized calls.

Ms. Beverly Nett of Incentives Unlimited in Greenville, SC, complained that her business is hampered by these computerized telephone calls. She said:

We have only six lines that come into our company and when one of the computerized messages come in, it is very frustrating because I cannot give them a piece of my mind because it is—like you said, it is going to go on and on. So if I simply hang up the phone on a computerized message, it rolls to the next line and to the next line, and somebody else in the office is picking it up. It even rolls into our fax machine and our fax machine will ring with these numbers. It takes time away from the office routine.

The telemarketing industry appears oblivious to the harm it is creating. Two months ago, a representative of the Direct Marketing Association said on television that telemarketers have a right to call us in our homes. This is absurd. I echo Supreme Court Justice Louis Brandeis, who wrote 100 years ago that "the right to be left alone is the most comprehensive of rights and the one most valued by civilized man".

Mr. President, I originally introduced this bill on July 11 of this year. Since then, my constituents in South Carolina and citizens around the country have deluged my office with letters of support for this bill. Senator INOUYE, the chairman of the Communications Subcommittee, held a hearing on the bill on July 24. Not one party at that hearing testified in opposition to the bill. Because of the enormous public support, the bill was ordered reported by the Commerce Committee, which I chair, and without objection on July 31.

Mr. Steve Hamm, administrator of the Department of Consumer Affairs in South Carolina, informed me that his office receives more complaints about computerized telephone calls and 900 numbers than any other problems. Despite the fact that South Carolina recently passed legislation to protect consumers from unwanted computerized calls within our State, South Carolina consumers continue to suffer from computerized calls made from out-of-State. The State law does not, and cannot, regulate interstate calls. Only Congress can protect citizens from telephone calls that cross State boundaries. That is why Federal legislation is essential.

In response to these continuing consumer complaints in South Carolina, Mr. Hamm asked me to come down to South Carolina to hear directly from my constituents about their problems with 900 numbers and computerized telephone calls. I chaired 2 days of hearing on October 10 in Greenville, SC, and on October 11 in Columbia, SC. These hearings gave consumers in South Carolina the opportunity to relate their real-life experiences with these calls and to suggest some improvements to the bill.

Mr. President, the substitute bill I am offering today contains a number of small changes to the bill that was reported by the Commerce Committee. These changes address concerns that were raised at the hearing in Washington and hearings in South Carolina, and in the additional comments that were received from the public.

The substitute bill contains a private right-of-action provision that will make it easier for consumers to recover damages from receiving these computerized calls. The provision would allow consumers to bring an action in State court against any entity that violates the bill. The bill does not, because of constitutional constraints, dictate to the States which court in each State shall be the proper venue for such an action, as this is a matter for State legislators to determine. Nevertheless, it is my hope that States will make it as easy as possible for consumers to bring such actions, preferably in small claims court. The consumer outrage at receiving these calls is clear. Unless Congress makes it easier for consumers to obtain damages from those who violate this bill, these abuses will undoubtedly continue.

Small claims court or a similar court would allow the consumer to appear before the court without an attorney. The amount of damages in this legislation is set to be fair to both the consumer and the telemarketer. However, it would defeat the purposes of the bill if the attorneys' costs to consumers of bringing an action were

greater than the potential damages. I thus expect that the States will act reasonably in permitting their citizens to go to court to enforce this bill.

The substitute also permits the States to enforce the provisions of the bill. Several parties, including the Federal Communications Commission [FCC] itself, raised concerns that the FCC might not have the resources to pursue violators of this bill. The will of the FCC to enforce the bill rigorously was also questioned, especially since the chairman of the FCC submitted testimony at the July hearing to indicate that he believed the bill was unnecessary. To address these allegations, the bill permits the State attorneys general to enforce the provisions of the bill in Federal court. These provisions are noncontroversial and are almost identical to the provisions of S. 1392, which have already passed the Senate as part of the omnibus crime bill.

The substitute bill specifically directs the FCC to initiate a rulemaking to consider whether, and to what extent, restrictions might apply to calls placed to business telephones. This provision has been included in response to complaints from some businesses that computerized telephone calls are tying up their business lines. The Supreme Court has generally recognized that persons at work do not have the same level of privacy protection as is afforded to persons in their homes. Thus, the legality of a ban on unwanted computerized telephone calls to the workplace is uncertain. Restrictions other than a ban on such calls, however, might be justifiable. If the FCC finds, after a notice and comment proceeding, that the record justifies some form of restriction on computerized calls to the workplace on constitutional and policy grounds, the FCC is free to adopt such regulations.

The substitute makes clear that computerized calls can be made to emergency lines and cellular or paging lines in emergency situations, or with the consent of the called party. It is not my intention in this bill to restrict the use of artificial or prerecorded voice messages in genuine emergency situations. Such emergency situations are to be defined by the FCC, but it is expected that situations which pose a threat to the health and safety of persons or property would be included in the definition of emergency.

The substitute extends the ban on computerized calls to cover patient and guest rooms in hospitals, elderly homes, or other similar health care facilities. The obvious purpose of this provision is to protect the health of persons who may find it difficult to answer the telephone. Such persons deserve the same amount of protection as persons in their homes, and possibly more protection. These persons suffer not only from an invasion of their privacy; they also suffer a potential risk to their health because of the difficulty in reaching the telephone.

This provision was added in response to numerous consumer complaints from persons who were lying in hospital rooms recovering from surgery and were disturbed by computerized telephone calls. Hospital patients often need extended hours of sleep or rest to aid their recovery. While the FCC might have defined either emergency lines or residence to include hospital guest rooms, I believe it is wiser to include this specific provision in the legislation to make clear our intent. Although this provision is to be interpreted by the FCC consistent with the constitutional guarantees of free speech it is not expected that this provision would apply to guest rooms in hotels or other where the privacy or health interests are not as great as those I have just described.

Finally, the substitute recognizes that the FCC has the authority to craft different rules, including an exemption, for certain types of calls. This provision responds to the concerns expressed by some telephone companies about new services, and some companies that use machines to place calls for debt-collection purposes. In considering the need for special rules, however, the FCC must be careful to ensure that its rules are fully consistent with the first amendment protections in the constitution. This bill carefully avoids drawing any distinctions among types of calls based on the content of the message being delivered. The provisions of this bill apply whether these calls are made for commercial, political, or other purposes. This content-neutral approach is essential to preserve the unbiased, nondiscriminatory nature of this legislation. If the FCC finds, however, that some distinctions can be justified on policy grounds and constitutional grounds, the FCC is free to adopt rules to recognize those distinctions.

The substitute bill also contains a number of minor clarifications that are consistent with the intent of the original bill. For instance, the substitute extends the ban on calling paging and cellular lines to specialized mobile radio, radio common carrier, and other services that charge the person receiving the call. The substitute also allows consent to be given orally, in writing, electronically, or by any other means, as long as the consent is expressly given to the particular entity making the call. Such consent could be obtained, for instance, by including a clause in a contract or purchase agreement indicating that signing the agreement constitutes the purchaser's express consent to receive a computerized call concerning that service or product. Such consent also could be obtained by a live person who simply asks the called party whether he or she agrees to listen to a recorded message.

This bill has been drafted to comply strictly with the first amendment guarantees of freedom of speech. The record of our hearings demonstrates that a ban on computerized calls to the home—except in emergencies or with the called party's consent—is the least restrictive means of protecting the consumer's privacy in the home. There is no other alternative that will protect the interests of the consumer. Any proposed new technology or other method of allowing consumers to avoid receiving these calls is likely to be ineffective or place too much of the burden on the consumer to protect his or her privacy interests.

Let me also make clear with respect to the Constitution that this legislation does not cover calls made by live persons. The intention of this bill is to deal directly with computerized calls. From the record of the hearings we have held and the consumer complaints we have received, it is clear that it is the computerized call that generates the most significant consumer outrage and that is most clearly an invasion of our privacy, a nuisance, and a threat to our health and safety. Mr. Hamm testified at our hearings in South Carolina:

And I think that while I have not found any individuals that are crazy about telephone solicitations generally, I have not talked to the first consumer nor the first business that welcomes these kinds of calls in terms of computer calls.

All this legislation requires is that when a person is called at home, there must be a live person at the other end of the line. This applies regardless of the message being delivered because it is an equal invasion of privacy whether the computerized message is made for political, charitable, or commercial purposes.

Mr. President, these changes have been fully shared and explored with the members of the industry and the consumer representatives who support this bill. There is no significant opposition to the bill. I believe Congress should carryout its duty to protect the integrity of the home and stop this unwarranted invasion of our privacy. I therefore urge the passage of this substitute bill by the Senate.

Mr. WARNER. Mr. President, I join my distinguished colleague from South Carolina, the chairman of the committee that has jurisdiction over this legislation, in urging the adoption of this legislation. Indeed, the most important thing we have in this country is our freedom and our privacy, and this is clearly an invasion of that.

Mr. HOLLINGS. I thank the distinguished colleague.

AMENDMENT NO. 1311

(Purpose: To make an amendment in the nature of a substitute, and to amend the title of the bill)

Mr. HOLLINGS. Mr. President, I send a substitute amendment to the desk and ask for its immediate consideration.

Case No. 1:24-cv-02286-CNS-NRN    Document 82-1    filed 02/05/26    USDC Colorado    pg 9 of 11
Case No. 1:24-cv-02286-CNS-NRN    Document 82-1    filed 02/05/26    USDC Colorado    pg 9 of 11

*November 7, 1991*    CONGRESSIONAL RECORD—SENATE    **30823**

The PRESIDING OFFICER. The clerk will report.

The legislative clerk read as follows:

The Senator from South Carolina [Mr. HOLLINGS] proposes an amendment numbered 1311.

Mr. HOLLINGS. Mr. President, I ask unanimous consent that the reading of the amendment be dispensed with.

The PRESIDING OFFICER. Without objection, it is so ordered.

The amendment is as follows:

Strike all after the enacting clause and insert in lieu thereof the following:

**SECTION 1. SHORT TITLE.**

This Act may be cited as the "Automated Telephone Consumer Protection Act."

**SEC. 2. RESTRICTIONS ON THE USE OF AUTOMATED TELEPHONE EQUIPMENT.**

(a) AMENDMENT.—Title II of the Communications Act of 1934 (47 U.S.C. 201 et seq.) is amended by adding at the end the following new section:

"SEC. 228. RESTRICTIONS ON THE USE OF AUTOMATED TELEPHONE EQUIPMENT.

"(a) DEFINITIONS.—As used in this section—

"(1) The term 'automatic telephone dialing system' means equipment which has the capacity—

"(A) to store or produce telephone numbers to be called, using a random or sequential number generator; and

"(B) to dial such numbers.

"(2) The term 'telephone facsimile machine' means equipment which has the capacity to transcribe text or images, or both, from paper into an electronic signal and to transmit that signal over a regular telephone line.

"(3) The term 'unsolicited advertisement' means any material advertising the commercial availability or quality of any property, goods, or services which is transmitted to any person without that person's prior express invitation or permission.

"(b) RESTRICTIONS.—

"(1) REGULATIONS.—The Commission shall prescribe regulations to make it unlawful for any person within the United States—

"(A) to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any automatic telephone dialing system or an artificial or prerecorded voice—

"(i) to any emergency telephone line (including any '911' line and any emergency line of a hospital, medical physician or service office, health care facility, or fire protection or law enforcement agency) or to the telephone line of any guest room or patient room of a hospital, health care facility, elderly home, or similar establishment; or

"(ii) to any telephone number assigned to a paging service, cellular telephone service, specialized mobile radio service, or radio common carrier service, or any other service for which the called party is charged for the call;

"(B) to initiate any telephone call to any residence using an artificial or prerecorded voice to deliver a message without the prior express consent of the called party, unless the call is initiated for emergency purposes;

"(C) to send an unsolicited advertisement by a facsimile machine; or

"(D) to use an automatic telephone dialing system in such a way that two or more telephone lines of a multi-line business are seized simultaneously.

"(2) PRIVATE RIGHT OF ACTION.—A person who has received more than one telephone call from the same entity, or delivering the same or a similar message, in violation of regulations prescribed under this subsection may, if otherwise permitted by the laws or rules of court of a State, bring in an appropriate court of that State an action in such person's own name to enjoin such calls, an action to recover for actual monetary loss or receive $500 in damages for each violation, whichever is greater, or both such actions. The court may, in its discretion, increase the award for monetary loss to an amount not to exceed three times the actual monetary loss up to $1,500 for each violation, or to increase the award of damages to an amount not to exceed $1,500 for each violation, if the court finds the defendant willfully or knowingly violated such regulations.

"(3) CALLS TO BUSINESSES.—In the course of its rulemaking proceeding to prescribe regulations under paragraph (1), the Commission shall consider prescribing regulations to allow businesses to avoid receiving calls made using an artificial or prerecorded voice message to which they have not given their prior express consent.

"(4) EXEMPTIONS AND OTHER PROVISIONS.—In the course of its rulemaking processing to prescribe regulations under paragraph (1), the Commission shall also determine whether and to what extent the regulations should include exemptions and other provisions to address special circumstances, consistent with the public interest, convenience, and necessity.

"(c) TECHNICAL AND PROCEDURAL STANDARDS.—

"(1) PROHIBITION.—It shall be unlawful for any person within the United States—

"(A) to initiate any communication using a telephone facsimile machine, or to make any telephone call using any automatic telephone dialing system that does not comply with the technical and procedural standards prescribed under this subsection, or to use any telephone facsimile machine or automatic telephone dialing system in a manner that does not comply with such standards; or

"(B) to use a computer or other electronic device to send any message via a telephone facsimile machine unless such person clearly marks, in a margin at the top or bottom of each transmitted page of the message or on the first page of the transmission, the date and time it is sent and an identification of the business, other entity, or individual sending the message and the telephone number of the sending machine or of such business, other entity, or individual.

"(2) TELEPHONE FACSIMILE MACHINES.—The Commission shall revise the regulations setting technical and procedural standards for telephone facsimile machines to require that any such machine which—

"(A) is manufactured after 6 months after the date of enactment of this section, and

"(B) can be used for the distribution of unsolicited advertising,

clearly marks, in a margin at the top or bottom of each transmitted page or on the first page of each transmission, the date and time sent, an identification of the business, other entity, or individual sending the message, and the telephone number of the sending machine or of such business, other entity, or individual. The Commission shall exempt from such standards, for 18 months after such date of enactment, telephone facsimile machines that do not have the capacity for automatic dialing and transmission and that are not capable of operation through an interface with a computer.

"(3) ARTIFICIAL OR PRERECORDED VOICE SYSTEMS.—The Commission shall prescribe technical and procedural standards for systems that are used to transmit any artificial or prerecorded voice message via telephone. Such standards shall require that—

"(A) all artificial or prerecorded telephone messages (i) shall, at the beginning of the message, state clearly the identity of the business, individual, or other entity initiating the call, and (ii) shall, during or after the message, state clearly the telephone number or address of such business, other entity, or individual; and

"(B) any such system will automatically release the called party's line within 5 seconds of the time the system receives notification that the called party has hung up, to allow the called party's line to be used to make or receive other calls.

"(d) STATE LAW NOT PREEMPTED.—Nothing in this section or in the regulations prescribed under this section shall preempt any State law that imposes more restrictive intrastate requirements or regulations on, or which prohibits—

"(1) the use of telephone facsimile machines or other electronic devices to send unsolicited advertisements;

"(2) the use of automatic telephone dialing systems to transmit prerecorded telephone solicitations; or

"(3) the use of artificial or prerecorded voice messages.

"(e) ACTIONS BY STATES.—

"(1) AUTHORITY OF STATES.—Whenever the attorney general of a State, or an official or agency designated by a State, has reason to believe that any person has engaged or is engaging in a pattern or practice of telephone calls to residents of that State in violation of the regulations prescribed under this section, the State may bring a civil action on behalf of its residents to enjoin such calls, an action to recover for actual monetary loss or receive $500 in damages for each violation, or both such actions. The court may, in its discretion, increase the award for monetary loss to an amount not to exceed three times the actual monetary loss up to $1,500 for each violation, or to increase the award of damages to an amount not to exceed $1,500 for each violation, if the court finds the defendant willfully or knowingly violated such regulations.

"(2) EXCLUSIVE JURISDICTION OF FEDERAL COURTS.—The district courts of the United States, the United States courts of any territory, and the District Court of the United States for the District of Columbia shall have exclusive jurisdiction over all civil actions brought under this subsection. Upon proper application, such courts shall also have jurisdiction to issue writs of mandamus, or orders affording life relief, commanding the defendant to comply with the provisions of regulations prescribed under this section, including the requirement that the defendant take such action as is necessary to remove the danger of violation of any such regulations. Upon a proper showing, a permanent or temporary injunction or restraining order shall be granted without bond.

"(3) RIGHTS OF COMMISSION.—The State shall serve prior written notice of any such civil action upon the Commission and provide the Commission with a copy of its complaint, except in any case where such prior notice is not feasible, in which case the State shall serve such notice immediately upon instituting such action. The Commission shall have the right (A) to intervene in the action, (B) upon so intervening, to be heard on all matters arising therein, and (C) to file petitions for appeal.

"(4) VENUE; SERVICE OF PROCESS.—Any civil action brought under this subsection in a

district court of the United States may be brought in the district wherein the defendant is found or is an inhabitant or transacts business or wherein the violation occurred or is occurring, and process in such cases may be served in any district in which the defendant is an inhabitant or wherever the defendant may be found.

"(5) INVESTIGATORY POWERS.—For purposes of bringing any civil action under this subsection, nothing in this section shall prevent the attorney general of a State from exercising the powers conferred on the attorney general by the laws of such State to conduct investigations or to administer oaths or affirmations or to compel the attendance or witnesses or the production of documentary and other evidence.

"(6) EFFECT ON STATE COURT PROCEEDINGS.—Nothing contained in this subsection shall be construed to prohibit an authorized State official from proceeding in State court on the basis of an alleged violation of any general civil or criminal statute of such State.

"(7) LIMITATION.—Whenever the Commission has instituted a civil action for violation of regulations prescribed under this section, no State may, during the pendence of such action instituted by the Commission, subsequently institute a civil action against any defendant named in the Commission's complaint for any violation as alleged in the Commission's complaint.

"(8) DEFINITION.—As used in this subsection, the term 'attorney general' means the chief legal officer of a State.".

(b) CONFORMING AMENDMENT.—Section 2(b) of the Communications Act of 1934 (47 U.S.C. 152(b)) is amended by striking "and 225" and inserting in lieu thereof ", 225, and 228".

The PRESIDING OFFICER. If there be no further debate, the question is on agreeing to the amendment of the Senator from South Carolina.

The amendment (No. 1311) was agreed to.

Mr. INOUYE. Mr. President, I rise today to voice my support for S. 1462, the Automated Telephone Consumer Protection Act offered by my good friend and colleague, Senator HOLLINGS, and S. 1410, the Telephone Advertising Consumer Rights Act offered by my other good friend, Senator PRESSLER. These bills address an urgent and pressing problem in American society—the proliferation of machine-generated and live telephone calls.

I have great respect for the telemarketing industry. Telemarketing is a useful and cost-effective tool for many merchants. But telemarketers must learn not to take advantage of their technology. They must learn to respect the privacy rights of consumers in their homes. They must learn not to tie up the telephone or fax lines of businesses without prior consent. And they must ensure that they limit the danger to emergency services.

The two bills before the Senate today, Senator HOLLINGS' bill to regulate computerized telephone calls, and Senator PRESSLER's bill to regulate calls by live persons, are reasonable attempts to protect consumers, businesses, and emergency services from unwanted telephone calls. There is overwhelming support for both of these bills, and these substitute versions reflect the substantial input of the telemarketing industry. I applaud both my colleagues for their work to protect the telephone consumer, and look forward to having these bills enacted into law before the end of this year.

Mr. BENTSEN. Mr. President, I join my colleague, the distinguished Senator from South Carolina, Senator FRITZ HOLLINGS, in supporting the immediate passage of S. 1462, the Automated Telephone Consumer Protection Act of 1991. This bill addresses an issue of great concern to many of my Texas constituents and people all over the country: The unreasonable encroachment upon their privacy by unsolicited, automated telephone calls to homes, businesses, and public institutions and by the unsolicited use of facsimile machines to transmit advertising.

Automatic dialer recorded message players are used by telemarketers to automatically dial a telephone number and deliver an artificial or prerecorded voice message. The use of these machines makes long distance telemarketing much less expensive. As a result, these machines are widely used and the telemarketing industry has grown by immense proportions.

Advertisements for all kinds of consumer products, trips, investments, credit cards, and sweepstakes are frequently communicated to home, business, and cellular telephones, as well as paging machines, through the use of automated calls. Such advertisements are also transmitted to facsimile machines. One survey found that about 75 percent of the public favor some form of regulation of these calls, and one-half of these favored prohibiting all unsolicited calls.

As Senator HOLLINGS has noted, consumer complaints about the use of these machines and the use of junk fax have steadily increased.

This bill would ban all unsolicited automated calls to the home that are not made for emergency purposes. It would also ban all automated calls to emergency telephone lines, cellular telephones, and paging systems. Furthermore, it would ban all unsolicited advertising to facsimile machines.

In spite of the traditional hesitancy of Congress to pass legislation that regulates a particular industry or technology, we must enact this bill in order to avoid the unreasonable interference with the privacy of consumers and the normal conduct of public and private business. I urge my colleagues to endorse this important legislation that will restrict the use of automated calling and junk fax, without making distinctions based upon the content of the respective communications.

The PRESIDING OFFICER. The bill is open to further amendment. If there be no further amendment to be proposed, the question is on agreeing to the committee amendment in the nature of a substitute, as amended.

The committee amendment in the nature of a substitute, as amended, was agreed to.

The PRESIDING OFFICER. The question is on the engrossment and third reading of the bill.

The bill was ordered to be engrossed for a third reading, was read the third time, and passed.

[The bill (S. 1462) will appear in a subsequent issue of the RECORD.]

Mr. HOLLINGS. Mr. President, I move to reconsider the vote.

Mr. WARNER. I move to lay that motion on the table.

The motion to lay on the table was agreed to.

The title was amended so as to read: "A bill to amend the Communications Act of 1934 to prohibit certain practices involving the use of telephone equipment.".

CHANGE OF VOTE—ROLLCALL 246

Mr. WARNER. Mr. President, I propound a unanimous-consent request which has been cleared by both the majority and Republican leader. I ask unanimous consent to change my vote from "nay" to "yea" on rollcall 246, adopting the conference report on H.R. 2707 for fiscal year 1992 Labor-Health and Human Services and Education appropriations bill. The measure was approved by a majority, 72 to 25, and the addition of an affirmative vote, making 73 to 24, will have no effect on the outcome.

The PRESIDING OFFICER. Without objection, it is so ordered.

(The foregoing tally has been changed to reflect the above order.)

Mr. HOLLINGS. Mr. President, I suggest the absence of a quorum.

The PRESIDING OFFICER. The absence of a quorum having been suggested, the clerk will call the roll.

The legislative clerk proceeded to call the roll.

Mr. BOREN. Mr. President, I ask unanimous consent that the order for the quorum call be rescinded.

The PRESIDING OFFICER. Without objection, it is so ordered.

SENATE REFORM

Mr. BOREN. Mr. President, as we come near the close of this legislative week, I again want to discuss an issue that I have been discussing now on a weekly basis in the Senate with our colleagues and with the American people. That is a need to reform Congress as an institution. All of us realize that we have serious problems with the functioning of this institution. There are constructive changes that need to be made so that we can better fulfill our responsibilities, to grapple with the problems which confront us.

*November 7, 1991*      CONGRESSIONAL RECORD—SENATE      30825

The last time that Congress took a major look at itself and made sweeping reforms at its own internal structures and procedures was in the period immediately after World War II, as the cold war was about to begin. In 1946, 1947, the Monroney-La Follette Commission was established by a joint action of the House and Senate to examine the institution of Congress, to make sure that the Congress was ready to meet the challenges of a new age.

The cold war was beginning. The superpower confrontation was beginning. There were major challenges to be met. And the result of that study, which was carried on for almost a year by Members of the House and the Senate, with the help of outside experts, staff donated by the American Political Science Association, resulted in a major overhaul of Congress as an institution.

The committee structure was rationalized in both the House and Senate so that the jurisdiction was identical in the two Houses, so that when conference committees met, they had but two committees to meet in conference. We are often now confronted, as jurisdictions are basically different between the House and the Senate, sometimes with as many as 8, 9, 10, even a dozen committees having partial jurisdiction over the matters of disagreement between the House and the Senate.

As I said a few days ago on the Senate floor, sometimes it seems more appropriate to rent out the Versailles Palace and the Hall of Mirrors to have a conference committee, because so many people are involved. Sometimes, over a hundred people are involved in a conference committee, trying to work out a compromise between the House and the Senate.

So one of the major elements of the changes made back in the period immediately after the end of World War II was to rationalize the committee structure and to make sure that there was parallel jurisdiction between the two Houses so that we could work together more easily.

Now that the cold war is coming to an end, and now that we confront, again, new challenges for our country, a new world situation, a situation that will require a whole different set of assets that remain influential in the world and play a leadership role, it is time again for Congress to take a look at itself.

We have, of course, been impacted by the events of the last several weeks, and our proposal in Senate Concurrent Resolution 57 was one that was submitted before the events of the last few weeks. But they have only, I think, intensified the interest of the American people in this proposal, and the consideration which should be given to it by our colleagues in the Senate and the House.

We have been buffeted by events, by the publicity about the operation of the House bank, by a very controversial and divisive confirmation process on the Thomas nomination, and by other events that have caused the American people to express an even higher level of dissatisfaction with the Congress and an even lower level of trust in this institution.

It is not only, however, just because of those criticisms that have been leveled at the Congress that I think it is time for us to undertake a major reform effort; it is because all of us know from our personal experience that we could do our job better. I view this as not a time simply for reacting to criticism, although I think we should heed the voices of the people which have expressed dissatisfaction with the performance of Congress and the performance of Government in general.

But I think we should also view it as an opportunity, a constructive opportunity to set up a structure here that is appropriate for the changed world environment, a structure that will make it easier for us to consider the major policy questions that confront us, to rebuild the economic strength of this country, to rebuild our social strength, to revitalize our educational programs, to combat the need to improve the competitiveness of American business and industry in world markets, to change tax policy to encourage investment and savings and increased productivity.

Major decisions need to be made. Major problems need to be confronted, and many of us, at the end of a legislative week, or at the end of a legislative day in which we put in long hours, often are left with the feeling that while we have been caught up in almost continuous activity, that sometimes not much of it has been directed to the big problems that confront our country; that we have been weighted down with trivia, with legislative proposals that are not really important enough to take our time, and that it becomes more and more difficult for us to have time for reflection, for consultation with one another, and for even focusing the activities of our committee on those big problems, those big issues of policy that in the final analysis will determine whether or not we are really leading America into the next century, prepared for the challenges that we will have to meet.

Changing the structure of Congress, reforming the structure of Congress itself, passing meaningful campaign finance reform so that we will be able to devote more of our time and attention to the solving of problems instead of the raising of money for the next campaign, will not in themselves guarantee that we will have either the insight or the vision or the political courage to do what we need to do to serve our country well.

But by devising a structure and by changing the campaign laws so that we will have more of our time available to focus on the real problems of this country, we at least create an atmosphere in which there is a greater likelihood we will make the decisions that need to be made for the sake of our country.

So, Mr. President, I do not say that congressional reform, the reform of this Congress as an institution, the getting under control of the bureaucracy of this institution, the rationalizing of the 300 committees and subcommittees which we have, the examination and improvement of our rules so that we can take up one subject matter at a time and consider it without the disruption of extraneous matters being added as amendments during the process, and many other items that we should at least consider with an open mind as we review where Congress is, I am not saying that doing these things alone will assure us a first-rate educational system or a balanced budget or a tax policy that will enable us to save and invest and compete in the world marketplace or a health program that will serve the needs of all Americans and make health care, basic health care available at affordable prices to the American people or will take care of the unemployed or will reform the welfare system so that people can be put to work doing something productive in return for any payments which they receive from the Government.

Those actions will not automatically follow from campaign finance reform or from reform of the structure of this institution. But I do believe, Mr. President, that they will make the focus on these problems more likely and they will make it more likely that we will have a positive result and take the right actions in this area.

Mr. President, as I said when I began these discussions on the floor several days ago and indicated that I would continue to come to the floor each and every week until there is action to commence hearings on this proposal and until there is a positive action on behalf of both Houses to enact campaign finance reform and to start the process of taking an objective look at ourselves in terms of how we function, the efficiency with which we function, the manner in which we function—as I said when I began the discussion of these issues, we are the trustees of the Senate. We occupy these chairs. They do not belong to us. They belong to the people.

When we open the drawers and look at the names that are inscribed in the drawers of all of these desks, following the tradition of 200 years of Members of this institution to write their names or carve their names inside the desk drawers, and we pull open those drawers and we see those names written there, the Websters, the Clays, the Calhouns, the Tafts, the La Follettes, those who have served as President of